IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ROME R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ROME R., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LEROY R., APPELLANT.

Filed April 12, 2022.   No. A-21-777.

Appeal from the Separate Juvenile Court of Sarpy County: ROBERT B. O'NEAL, Judge. Affirmed.

Katrine M. Herrboldt for appellant.

Sarah M. Moore, Deputy Sarpy County Attorney, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

INTRODUCTION

LeRoy R. appeals the order of the Sarpy County Separate Juvenile Court continuing temporary custody of his minor child with the Nebraska Department of Health and Human Services (DHHS) and excluding placement with him. For the reasons set forth herein, we affirm.

STATEMENT OF FACTS

Sara G. is the biological mother of Rome R., born on July 22, 2021. Upon Sara's admission to the hospital to give birth to Rome on July 22, she initially tested positive for amphetamines which, pursuant to a later more specific test, narrowed the test result to a positive test for methamphetamine. Hospital staff noted there were complications with Rome's birth including that Rome was "throwing up a green substance" and was having difficulty regulating her body

- 1 -

temperature. There were also concerns that Rome was exhibiting symptoms of methamphetamine withdrawal leading to a test of Rome's umbilical cord which confirmed that Rome had been born with methamphetamine in her system. These complications required Rome to remain in the Neonatal Intensive Care Unit (NICU) for approximately two weeks.

Sarpy County Sheriff's Investigator Joe Benak was assigned to investigate the report. On July 23, 2021, Benak identified Sara as Rome's custodial parent. At the time of Rome's birth, Sara did not identify LeRoy as Rome's father and no one was listed as the father on Rome's birth certificate. Benak's investigation concluded with the filing an affidavit to remove Rome from Sara's custody. In part, Benak's affidavit set forth that

[Sara] tested positive for amphetamine when she was admitted [to the hospital] and tested positive again on today's date [July 23, 2021]. . . . [Sara] admitted to using methamphetamine 3-4 days ago stating she took three "hits" when she smoked it. [Sara] stated [that] while pregnant with Rome she used methamphetamine a total of three times. [Sara] stated before she was pregnant she was using methamphetamine at least twice a week.

The affidavit further set forth that Rome was "temporarily placed in the custody of [DHHS]" and that such placement "was a matter of immediate and urgent necessity for the protection and safety of [Rome] and precluded reasonable efforts to allow [Rome] to remain in the parental/custodial home." Benak's affidavit did not provide any information on Rome's father. LeRoy did not sign Rome's birth certificate and acknowledge paternity until July 24, 2021, which was 1 day following the law enforcement investigation and removal of Rome.

On July 26, 2021, the juvenile court entered an ex parte order continuing Rome's placement with DHHS pending a protective custody hearing. The court noted that Rome "tested positive for amphetamines (sic) . . . [Sara] admitted using methamphetamines 3-4 days prior and during her pregnancy." The court further found that those facts demonstrated that returning Rome to her home would be contrary to her health, safety, and welfare; that the facts constituted an emergency which threatened Rome's safety and removal was necessary to protect Rome's safety; and that reasonable efforts had been made to prevent or eliminate the need for the removal of Rome from her home. The court then set the matter for a protective custody hearing.

Also, on July 26, 2021, the State filed an adjudication petition which contained allegations regarding both Sara and LeRoy. The adjudication petition alleged that Rome was a minor child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) as she lacked proper parental care by reason of Sara's fault or habits in that:

On or about July 23, 2021, [Rome] was removed from [Sara's] care after [Sara] admitted to the use of methamphetamine shortly before the birth of [Rome]. On or about September 2020, an older child was placed in the care [that child's] father after [Sara] was arrested when methamphetamine was found in [Sara's] home and for leaving that child home alone for an extended period of time without adult supervision.

The petition also alleged that Rome lacked proper parental care by reason of LeRoy's fault or habits in that "[o]n or about July 23, 2021, [Rome] was removed from [LeRoy's] care after [Sara]

admitted to the use of methamphetamine. At the time of [Sara's] use, [LeRoy] was residing in [Sara's] home." Several days later, the allegations regarding LeRoy were amended to set forth:

> On or about July 23, 2021, [Rome] was removed from [LeRoy's] care after [Sara] admitted to the use of methamphetamine. [Sara] and [LeRoy] reside in the same home. On or about July 25, 2021, [LeRoy] and [Sara] left the hospital for approximately 45 minutes. After [Sara] returned, she tested positive for amphetamine. [LeRoy] has four older children that he does not reside with or provide care for.

At the July 29, 2021, protective custody hearing, the court appointed counsel for LeRoy and proceeded with the hearing as to Sara. Sara did not contest protective custody, however LeRoy did. The court's August 2 protective custody order continued temporary custody of Rome with DHHS for placement based upon the court's finding that further detention of Rome was a matter of immediate and urgent necessity for Rome's protection and that continued placement in the home was contrary to Rome's best interests, health, safety and welfare because of information contained in the affidavit of removal. The court awarded both parents supervised parenting time with Rome. At LeRoy's request, a contested protective custody hearing was scheduled for August 27, 2021.

On August 6, prior to the contested protective custody hearing, Rome was discharged from the hospital and placed in a kinship placement with her half-sister's father, Zachary B., and his wife. Also prior to the contested protective custody hearing, the court held the pretrial conference. The court's pretrial findings and order set forth, in part:

> That the following reasonable efforts have been made to prevent the removal of [Rome] from the home of [her] parents: supervised parenting [time], [family support worker], UA's for both parents, evaluations are referred for both parents . . .

During the August 27, 2021, contested protective custody hearing, the State adduced testimony from several witnesses including Theri McCarville, a NICU and high-risk OB social worker; Chelsea Riediger, a family services specialist with DHHS; Audrey Stevenson, Rome's current case manager; and Zachary B., Rome's foster parent and the biological father of Rome's half-sister, Ariel G. The court received into evidence two exhibits: a July 2021 court detention report authored by Riediger and Benak's July 23 affidavit for removal.

THERI MCCARVILLE

McCarville, a NICU and high risk OB social worker, testified that Rome was assigned to her caseload on July 23 after being placed in the NICU. McCarville's job duties include completing an assessment for every admission; reviewing records, physician and nursing notes, and lab results; meeting with parents "to look at the strengths that they have in their lives and resources they need"; and assisting with discharge planning.

During a July 27, 2021, meeting with LeRoy and Sara, McCarville explained her role and her ability to provide support and resources. McCarville testified that she received several concerning reports regarding LeRoy including that he was planning to move out of the home he shared with Sara because "he didn't want to be associated with [Child Protective Services (CPS)] if CPS were to be involved" due to Sara's and Rome's positive tests for methamphetamine; that LeRoy had approached a couple exiting the hospital and expressed that the baby looked like his

baby, asked the couple "are you sure that is your baby" and, after being told that the baby was theirs, he approached the couple a second time and asked "are you sure that is your baby?"; and, prior to his name being added to Rome's birth certificate, LeRoy became disgruntled after he was not allowed to visit Rome. Finally, McCarville mentioned that, on July 25, 2021, Sara had left the hospital with LeRoy and when Sara returned, Sara underwent a urinalysis test which revealed she tested positive for methamphetamine and that Sara had admitted using methamphetamine 3 or 4 days prior to her July 22 admission to the hospital for Rome's birth. McCarville testified that, based upon her education, training, and experience, taking into account Sara's admission to using methamphetamine 3 or 4 days prior to her hospital admission, it was unlikely that she would still test positive for methamphetamine on July 25. However, she admitted that Sara had been drug tested every day that she was in the hospital and her test results were positive each day.

CHELSEA RIEDIGER

Riediger, a DHHS child and family services specialist, testified that she was assigned to Rome's case the day after Rome's birth due to Sara's positive drug test upon Sara arriving at the hospital to give birth. Riediger noted several concerns including that Rome had just been returned to the NICU following a procedure to determine why Rome was "throwing up a green substance"; that Rome was not able to regulate her body temperature; and that Rome might be exhibiting symptoms of methamphetamine withdrawal which concerns were corroborated when a test of Rome's umbilical cord determined that Rome had been born with methamphetamine in her system.

Part of Riediger's job was to assess for the safety of children and the suitability of parents when safety concerns may be present in the home. In conducting her initial assessment of this case, Riediger reviewed previous intakes regarding Sara and her older daughter, Ariel. Riediger located intakes involving Ariel, the most recent occurring in June 2020, that resulted in full custody of Ariel G. being placed with the child's father, Zachary B. Riediger then worked with Benak who wrote the affidavit for removal of Rome from Sara's care. Riediger noted that Benak's affidavit only mentioned Sara because, during her initial conversation with Sara at the hospital, Sara "had stated she was unsure if [LeRoy] would be signing the birth certificate." However, after LeRoy signed Rome's birth certificate on July 24, 2021, Riediger considered placing Rome with LeRoy and investigated whether placing Rome in LeRoy's care would be appropriate and safe. Riediger's investigation included reviewing his prior criminal history; reviewing previous child abuse and neglect cases involving LeRoy's other 4 children; speaking with LeRoy and Sara; and speaking with Zachary and Ariel. Riediger testified that there had been 7 calls to the child abuse and neglect hotline regarding LeRoy's other 4 children with 4 of the reports accepted for initial assessment. However, Riediger noted that those intakes primarily concerned the care that LeRoy's wife provided to those children. When Riediger met with LeRoy, he informed her that he had not seen or had contact with his children, other than Rome, since 2015. Further, although LeRoy stated that he was paying child support, records showed that he was more than $8,000 in arrears. Riediger testified that her investigation revealed additional concerns regarding LeRoy's criminal history including a misdemeanor assault and battery charge in 2018, a history of domestic violence, and two counts of DUI.

Riediger also testified that, based on her investigation, she had concerns that LeRoy was using methamphetamines. She testified that she had been trained to look for signs of drug use in

parents and that some signs of methamphetamine use were erratic behaviors including extremely angry behavior, speaking very fast, and the inability to sit still including pacing or constant fidgeting. Riediger testified that, during one of her telephone conversations with LeRoy, she observed that LeRoy displayed extreme anger, "very fast speech that was sometimes jumbled together," and, an inability to sit still as reported by LeRoy who stated that "he was pacing around the parking lot while [they] were on the phone." However, Riediger did not find a criminal history of drug use for LeRoy.

Further, Riediger was concerned by LeRoy's admission that he knew that Sara had a positive urinalysis test in March or April 2021 while she was pregnant with Rome and that LeRoy had found a cup of "fake urine" in the bathroom which caused him concern that Sara "was using it to pass her urinalysis test" but that LeRoy failed to call the hotline to report her use or do anything to help stop Sara from using methamphetamines. However, Riediger later admitted in her testimony that LeRoy stated that he had informed Sara's probation or diversion officer regarding his concerns that Sara may have falsified a drug test with synthetic urine.

Riediger also received a report that, on July 25, 2021, Sara and LeRoy left the hospital for between 45 minutes to an hour and that, when Sara returned to the hospital, Sara tested positive for methamphetamines. Hospital personnel informed Riediger that it was "very unlikely" that, after her initial positive test upon being admitted to the hospital to give birth, Sara would continue to test positive for methamphetamines on July 25 without using sometime in the interim. Despite Riediger's concern about methamphetamine use by LeRoy, she testified that "[DHHS] policies do not allow us to ask for a [urinalysis] to determine if substances are being used." Riediger also expressed concern that LeRoy was residing with Sara who was actively using methamphetamines.

Ultimately, Riediger determined that placement with LeRoy was not in Rome's best interests due to safety concerns including that LeRoy and Sara resided together, potential methamphetamine use by LeRoy, LeRoy's knowledge of Sara's methamphetamine use and failure to take steps to protect his unborn child, and concern there was a lack of protective capacity for his other 4 children. Riediger placed Rome in a kinship placement with her maternal half-sister's family. Riediger explained that, although she was aware of LeRoy's preference for Rome to be placed with him in the home of LeRoy's mother, Riediger determined that placement with LeRoy would not be the best placement for Rome because of concerns that LeRoy would continue to reside with Sara. She also expressed concerns regarding LeRoy's mother's admissions about having suspicions and noticing unusual behaviors by Sara and, further, that LeRoy informed his mother of Sara's positive urinalysis during Sara's pregnancy, but his mother failed to report the incident to the child abuse and neglect hotline.

Although LeRoy stated that "he would be willing to move to his mother's house if that's what the agency wanted to see," Riediger responded that LeRoy "had to make his own decisions, and [DHHS] would respond based upon those decisions." Riediger also testified that, although LeRoy requested that she set up drug testing for him, she could not do so because "[a]s an IA worker, I'm not allowed to set up those types of tests." LeRoy also inquired regarding the possibility of doing a chemical dependency evaluation which she included in her recommendations for the protective custody hearing. Riediger also stated that LeRoy requested that Rome be placed with other relatives including his aunt, but that DHHS policy is that if a child cannot be placed

with the second parent, they then look to a kinship placement with siblings, and then they would look to place the child with extended relatives.

Riediger expressed that reasonable efforts to prevent Rome's removal from LeRoy included her assessment for safety concerns.

AUDREY STEVENSON

Audrey Stevenson, Rome's case manager, testified that she did not currently support Rome being placed with LeRoy, because of concerns when the case came in, that placement with LeRoy was determined to be unsafe, and that she needed more information from LeRoy before placement with him would be appropriate. Stevenson also expressed concern that LeRoy is not an active parent to his 4 older children. Stevenson testified that she sent a referral for drug testing for LeRoy on July 30, 2021, and that he had done 2 voluntary tests which both came back negative. In response to LeRoy's inquiry regarding a chemical dependency evaluation, Stevenson instructed him to apply for Medicaid and, if Medicaid denied the request for an evaluation, then the State would provide the evaluation. She also testified that LeRoy indicated that he would move out of Sara's home if that would facilitate placement of Rome with him and that he would agree not to facilitate contact between Sara and Rome if that was part of a safety plan. Additionally, Stevenson testified that she was unable to overrule a DHHS assessment of an unsafe home but, pursuant to LeRoy's request, Stevenson had conducted a safety assessment of his aunt's home as a placement for Rome and agreed to change placement of Rome to the aunt's home. She also testified that once a child has been removed, she reassesses for reunification in 3 months.

ZACHARY B.

Zachary testified that he was currently Rome's foster parent and that Rome was related to his oldest daughter, Ariel. Zachary testified that he became familiar with LeRoy in approximately May 2020 when LeRoy started dating Sara. After Zachary learned that Sara was dating LeRoy, he became concerned about Ariel's safety when she was in Sara and LeRoy's care, including that Ariel had been left home unattended. On one occasion, the Sarpy County Sheriff's Department notified Zachary to pick up Ariel at Sara's home at 1:45 a.m. because Ariel had been left home unattended and Ariel had found a bag of methamphetamine in Sara's home. As a result of those concerns, Zachary sought, and obtained, sole custody of Ariel. At the time of the protective custody hearing, Sara had 1 hour of supervised supervision with Ariel every other week. According to Zachary, 13-year-old Ariel has expressed that "she does not want to see or have anything to do" with LeRoy, that she does not feel safe around him, and that "being in [LeRoy's] presence makes her anxiety go crazy." Zachary also testified that Ariel described that she had been to Leroy's house, separate from Sara's home, and that his house made her "extremely uncomfortable" because it has "multiple holes in the wall from what [appeared] to be knife and fists into the walls," and

> . . . there [are] multiple holes in [LeRoy's] mattress . . . that appear to be knife holes also. The interior of the house has many cameras . . . [and] is also very dark and has very dark coverings over all of the windows in the house; and also there [have] been parties there, and she [smelled] very odd odors at these parties.

On September 1, 2021, the juvenile court entered a written order continuing temporary custody of Rome with DHHS finding that further detention of Rome was a matter of immediate and urgent necessity for her protection; that continued placement in the home was contrary to Rome's best interests, health, safety and welfare because of information contained in the affidavit of removal which was received into evidence; and that reasonable efforts had been made to prevent or eliminate the need for Rome's removal from her home. Sara and LeRoy were both granted reasonable rights of supervised parenting time. Subsequently, the court entered an order nunc pro tunc that corrected scrivener's errors contained in the original order including that LeRoy and his counsel attended the hearing and that witnesses were sworn and evidence was adduced. LeRoy has timely appealed to this court.

## ASSIGNMENTS OF ERROR

LeRoy contends that the juvenile court erred in finding (1) that the State met its burden of proving by a preponderance of the evidence that [Rome] should remain in the [temporary care] and custody of [DHHS] with placement to exclude [LeRoy's home] and (2) that reasonable efforts had been made to prevent or eliminate the need for the removal of the minor child from his home. Brief for appellant at 9.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### CONTINUING TEMPORARY PLACEMENT WITH DHHS

LeRoy's first specific assignment of error is that the trial court erred "in finding that the State met its burden of proving by a preponderance of the evidence that [Rome] should remain in the [temporary care] and custody of [DHHS] with placement to exclude [LeRoy's home]." Brief for appellant at 9. In relation to this assignment, LeRoy argues that he

> was established as the legal father of Rome . . . when his name was entered on the birth certificate for Rome . . . on 24 July 2021. "The information upon which the State seeks an *ex parte* temporary detention order must be contained in the affidavit of one who has knowledge of the relevant fact." *In re Interest of Borius H.*, 251 Neb. 397, 400, 558 N.W.2d 31,33 [sic] (1997) quoting *In re Interest of R.G.*, 238 Neb. at 419-420, 470 N.W.2d at 791 (1991)[.] Following establishment of legal paternity, the legal record continues to be devoid of an affidavit prepared for the purpose of addressing removal and protective custody detention regarding [LeRoy] nor does the record reflect the filing of an ex parte motion to that effect.

Brief for appellant at 16-17.

LeRoy's argument pertains to the somewhat unusual posture of this case. At the time Investigator Benak removed Rome on July 23, 2021, due to Sara's use of methamphetamine and its impact on Rome, LeRoy had not identified himself as Rome's father and LeRoy was not listed on Rome's birth certificate. As such, the initial removal of Rome was naturally directed at Sara. The day after the July 23 removal of Rome, LeRoy signed Rome's birth certificate and identified himself as the father of Rome, who was born out-of-wedlock. On July 26, the State filed a petition seeking to adjudicate Rome as a child within the meaning of § 43-247(3)(a) against both Sara and LeRoy. The adjudication petition alleged that Rome was a minor child within the meaning of § 43-247(3)(a) in that Rome lacked proper parental care by reason of LeRoy's fault or habits in that "[o]n or about July 23, 2021, [Rome] was removed from [LeRoy's] care after [Sara] admitted to the use of methamphetamine. At the time of [Sara's] use, [LeRoy] was residing in [Sara's] home." Several days later, the allegations regarding LeRoy were amended to set forth:

> On or about July 23, 2021, [Rome] was removed from [LeRoy's] care after [Sara] admitted to the use of methamphetamine. [Sara] and [LeRoy] reside in the same home. On or about July 25, 2021, [LeRoy] and [Sara] left the hospital for approximately 45 minutes. After [Sara] returned, she tested positive for amphetamine. [LeRoy] has four older children that he does not reside with or provide care for.

LeRoy's argument appears to be that once Rome was removed from Sara's custody, the State or the peace officer had an obligation to file a separate affidavit directed at him, and the failure to do so invalidated the court's order entered after a protective custody hearing wherein the court refused to place Rome with LeRoy. We disagree.

It is a correct statement of the law that when a peace officer takes a juvenile into temporary custody pursuant to Neb. Rev. Stat. § 43-248(2) (Cum. Supp. 2020), the peace officer "shall make a full written report to the county attorney within twenty-four hours of taking such individual into temporary custody." Neb. Rev. Stat. § 43-250(2) (Cum. Supp. 2020). Likewise, when the State seeks an ex parte detention order, the corresponding motion must be accompanied by an affidavit of one who has knowledge of the relevant facts and such affidavit be presented to the juvenile court and be made part of the record of the proceedings. *In re Interest of Borius H.*, 251 Neb. 397, 559 N.W.2d 31 (1997).

At the time Investigator Benak removed Rome on July 23, 2021, he complied with this requirement by tendering an affidavit that set forth the relevant facts which he asserted warranted removal and LeRoy does not argue to the contrary. At that time, LeRoy had not been identified as Rome's father, so the affidavit was directed at Sara, who the State understood to be Rome's custodial parent. By the time LeRoy presented himself as Rome's father, Investigator Benak had already removed Rome from Sara's custody and placed her in the custody of DHHS although Rome physically remained in the NICU. Upon learning that LeRoy had since presented himself as the putative father of Rome, who was born out-of-wedlock, the State immediately filed an adjudication petition against both Sara and LeRoy seeking to adjudicate Rome as a child within the meaning of § 43-247(3)(a) as to both parents. The adjudication petition outlined the rationale by which the State sought custody of Rome. This action was followed by a timely protective custody hearing held on July 29, 2021, wherein the court appointed counsel for LeRoy. Sara did not contest custody at this hearing, but LeRoy did. Because LeRoy was contesting custody and

counsel had just been appointed for him, the court continued the contested custody hearing until August 27. The continuance provided LeRoy with an opportunity to contest the basis for the State's refusal to place Rome with him for the reasons outlined in the adjudication petition as amended.

In short, by the time LeRoy presented himself as Rome's biological father and sought placement of her, Rome had already been removed and was in the legal custody of the State, although she remained in the NICU. The State filed a petition directed against LeRoy outlining the reasons the State sought to adjudicate Rome as a child within the meaning of § 43-247(3)(a). LeRoy was granted a timely protective custody hearing and was provided a full and fair opportunity to litigate the issue of whether the parental preference principle should defeat the State's continued custody of Rome pending adjudication.

Neb. Rev. Stat. § 43-254 (Cum. Supp. 2020) sets forth the requirements for continuing to withhold a juvenile from his or her parent pending adjudication, and it provides, in part, as follows:

> If a juvenile has been removed from his or her parent, guardian, or custodian pursuant to subdivision (2) of section 43-248 [without a warrant where juvenile is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection], the court may enter an order continuing detention or placement upon a written determination that continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required under section 43-283.01.

Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Damien S.*, 19 Neb. App. 917, 815 N.W.2d 648 (2012). A detention hearing is a parent's opportunity to be heard on the need for removal and the satisfaction of the State's obligations. *Id.*

The State is not required to establish a specific harm or risk to the juvenile; it is enough if the evidence establishes by a preponderance of the evidence that the conduct or circumstances of the parent or custodian are such that it is contrary to the juvenile's welfare to remain in, or return to, the parental or custodial home. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997).

Although LeRoy does not separately argue that the evidence presented at the contested protective custody hearing was insufficient to satisfy the State's burden, upon our de novo review, we find there was sufficient evidence to find the State met its burden under a preponderance standard to continue protective custody with the State as to both Sara and LeRoy. We hold that LeRoy's specific argument – that the State's failure to direct an affidavit concerning him in connection with the protective custody process should defeat the court's continued protective custody order – on these facts, fails.

### REASONABLE EFFORTS

LeRoy's second assignment of error is that the juvenile court erred in finding that reasonable efforts had been made to prevent or eliminate the need for Rome's removal from his home. He argues that "[t]here was no evidence offered by the State that law enforcement

investigated and found [him] to pose an imminent risk for harm to [Rome]." Brief for appellant at 18.

As we stated in the preceding section, pursuant to § 43-254, once a juvenile has been temporarily removed from his or her home by a peace officer without a warrant or order of the court because the juvenile is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection, orders continuing such out-of-home placement require the court to make a written determination that reasonable efforts were made to preserve and reunify the family if required under § 43-283.01. See *In re Interest of DeWayne G., Jr. and Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). "In determining whether reasonable efforts have been made to preserve and reunify the family and in making such reasonable efforts, the juvenile's health and safety are the paramount concern." Neb. Rev. Stat. § 43-283.01(1) (Cum. Supp. 2020).

Here, after LeRoy signed Rome's birth certificate, Riediger investigated the possibility of placing Rome with LeRoy. Her inquiry included looking up LeRoy's criminal history, previous child abuse and neglect cases involving his four other children, speaking with relevant parties such as Zachary and Ariel, and speaking with Rouse. Riediger learned that LeRoy was aware that Sara was taking methamphetamines while pregnant but he did not intervene to protect his unborn child; that Sara left the hospital with LeRoy and, after returning approximately 1 hour later, she tested positive for methamphetamines; and that LeRoy had exhibited behaviors consistent with methamphetamine use. After conducting her safety assessment and inquiry into whether Rome could safely be placed with LeRoy, Riediger concluded that LeRoy was not an appropriate placement for Rome due to significant safety concerns.

Further, after LeRoy suggested his mother as an appropriate placement for Rome, Riediger investigated that placement. However, Riediger also determined that LeRoy's mother was not an appropriate placement because LeRoy's mother had admitted to having suspicions and noticing unusual behaviors by Sara and that LeRoy's mother failed to contact the child abuse and neglect hotline after LeRoy informed his mother of Sara's positive urinalysis during Sara's pregnancy.

Accordingly, reasonable efforts by the State to return Rome to LeRoy's custody included Riediger's inquiry into whether Rome could safely be placed with LeRoy or his mother. We also note other reasonable efforts were made by the State including placement of Rome in a kinship placement, discussions with the hospital nursing staff regarding LeRoy, looking into additional family members who would be able to better facilitate parenting time as requested by LeRoy, referring for a chemical dependency evaluation, providing LeRoy with resources and information to apply for Medicaid to obtain assistance with services, providing UA's for LeRoy, and supervised visitation. Accordingly, LeRoy's claim that the State did not provide reasonable efforts fails.

CONCLUSION

Based upon our de novo review, we find that the juvenile court did not err in finding that continued detention, pending adjudication, was necessary because Rome was at risk for harm if placed in LeRoy's care and that reasonable efforts had been made prior to removal.

AFFIRMED.